NO. 03-1717
Criminal

UNITED STATES COURT OF APPEALS

FOR THE EIGHTH CIRCUIT

───────────────────────────────

UNITED STATES OF AMERICA,

        **Plaintiff and Appellee,**

   vs.

GARY FLUTE, SR.,

        **Defendant and Appellant.**

───────────────────────────────

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

The Honorable Charles B. Kornmann
United States District Judge

───────────────────────────────

APPELLEE'S BRIEF

───────────────────────────────

JAMES E. McMAHON
United States Attorney
MIKAL HANSON
Assistant U.S. Attorney
225 S. Pierre St., Rm. 337
Pierre, SD  57501-2489
Telephone:  (605) 224-5402
Attorneys for Appellee.

## SUMMARY OF THE CASE
## AND REQUEST FOR ORAL ARGUMENT

Appellant Gary Flute, Sr., following a three-day trial, was convicted of two counts of Aggravated Sexual Abuse, one Count of Incest and two counts of Sexual Abuse of a Minor. The victims in this case were the Appellant's own daughters. At trial, the victims described to the jury multiple acts of sexual abuse, that occurred over an extended period of time, starting when they were very little, and continuing until there were minors.

On appeal, Flute contends that the United States prosecutor made an improper comment during trial, that the evidence was insufficient to support his convictions and that the trial court abused its discretion in allowing some leading questions of the victims.

The United States respectfully requests fifteen minutes for oral argument.

i

# TABLE OF CONTENTS

SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT  i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

ARGUMENTS

     I.    THE DISTRICT COURT DID NOT ABUSE ITS
        DISCRETION IN DENYING FLUTE'S MOTION FOR A
        MISTRIAL BASED ON THE PROSECUTOR'S
        COMMENTS EXPLAINING WHY CERTAIN EVIDENCE
        WAS RELEVANT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

     II.   THE DISTRICT COURT DID NOT ERR IN DENYING
        FLUTE'S MOTION FOR JUDGMENT OF ACQUITTAL
        BASED UPON THE GROUNDS THAT THE EVIDENCE
        WAS INSUFFICIENT. . . . . . . . . . . . . . . . . . . . . . . . . . 30

     III.  THE DISTRICT COURT DID NOT ABUSE ITS
        DISCRETION IN ALLOWING THE UNITED STATES TO
        ASK SOME LEADING QUESTIONS OF THE MINOR
        VICTIMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . 43

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Appellate Case: 03-1717    Page: 3    Date Filed: 05/15/2003 Entry ID: 1644254

# TABLE OF AUTHORITIES

CASES:                                                                Page

Chapman v. California, 386 U.S. 18 (1967) . . . . . . . . . . . . . . .  30

Durns v. United States, 562 F.2d 542 (8th Cir. 1977) . . . . .  30, 31

People v. King, 581 P.2d 739 (Colo. App. 1978) . . . . . . . . . . . .  34

People v. Wrigley, 443 P.2d 580 (Cal. 1968) . . . . . . . . . . . . . . .  34

State v. Becker, 351 N.W.2d 923 (Minn. Ct. App. 1984) . . . . . .  32

State v. Fahy, 440 P.2d 566 (Kan. 1968) . . . . . . . . . . . . . . . . .  34

State v. Kilpatrick, 578 P.2d 1147 (Kan. App. 1978) . . . . . . . . .  34

State v. Swallow, 350 N.W.2d 606 (S.D. 1984) . . . . . . . . . . . . .  32

State v. Wilcox, 808 P. 2d 1028 (Utah 1991) . . . . . . . . . . . . . 32-34

State v. Williams, 363 N.W.2d 911 (Minn. Ct. App. 1985) . . . . .  33

State v. Wonser, 537 P.2d 197 (Kan. 1975) . . . . . . . . . . . . . . .  34

United States v. Ballew, 40 F.3d 936 (8th Cir. 1994) . . . . . . . . .  38

United States v. Butler, 56 F.3d 941 (8th Cir. 1995) . . . . . . . . . .  38

United States v. Drake, 542 F.2d 1020 (8th Cir. 1976) . . . . . . . .  38

United States v. Fleming, 8 F.3d 1264 (8th Cir. 1993) . . . . . . . .  32

United States v. Franklin, 250 F.3d 653 (8th Cir. 2001) . . . . . . .  25

United States v. Grey Bear, 883 F.2d 1382 (8th Cir. 1989) . . . .  41

Appellate Case: 03-1717    Page: 4    Date Filed: 05/15/2003 Entry ID: 1644254

United States v. Huerta-Orozco, 272 F.3d 561 (8th Cir. 2001) . . 24, 25

United States v. Kragness, 830 F.2d 842 (1987) . . . . . . . . . . . 30

United States v. Lincoln, 630 F.2d 1313 (8th Cir. 1980) . . . . . . . 25

United States v. Littlewind, 551 F.2d 244 (8th Cir. 1977) . . . . . 41

United States v. Longie, 984 F.2d 955 (8th Cir. 1993) . . . . . . . . 41

United States v. Nabors, 762 F.2d 642 (8th Cir. 1985) . . . . . . . 41

United States v. Rossbach, 701 F.2d 713 (8th Cir. 1983) . . . . . . 41

United States v. Schepp, 746 F.2d 406 (8th Cir. 1984) . . . . . . . 38

United States v. Travis, 993 F.2d 1316 (8th Cir. 1993) . . . . . . . 24

United States v. Turner, 975 F.2d 490 (8th Cir. 1992) . . . . . 34, 35

United States v. Villalpando, 259 F.3d 934 (8th Cir. 2001) . . . . . 24

United States v. Wadlington, 233 F.3d 1067 (8th Cir. 2000) . . . . 25

STATUTES:

18 U.S.C. § 1153 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

18 U.S.C. § 2241(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 37

18 U.S.C. § 2243(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 3231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 3742(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Appellate Case: 03-1717   Page: 5   Date Filed: 05/15/2003 Entry ID: 1644254

SDCL 22-22-1(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

OTHER:

Fed. R. App. P. 4(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

Fed. R. Evid. 611(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39

<u>The Development Psychology of Time</u> (W. Friedman ed. 1982) . .  32

v

# JURISDICTIONAL STATEMENT

A.    <u>Jurisdiction</u>:

The United States submits the trial court jurisdiction was based on 18 U.S.C. §§ 1153 and 3231, as appellant Gary Flute, Sr. was found guilty of committing federal crimes in Indian Country. The district court sentenced Flute on February 26, 2003. Flute timely appealed from that judgment on March 13, 2003. Fed. R. App. P. 4(b). This Court has jurisdiction of the appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

B.    <u>Parties and Record</u>:

The Appellee, United States of America, shall be referred to as the "United States." The Appellant, Gary Flute, Sr., shall be referred to as "Gary Flute," or "Flute." The victims shall be referred to by the letters "A.F." and "Y.F."

References to the record will be made as follows: Trial Transcript "T," followed by the appropriate page number; the Clerk of Court's docket sheet record "R," followed by the appropriate docket number; Appellant's Brief "AB," followed by the appropriate page number; and the District Court's Order Denying Motion for Judgment of Acquittal

1

and Motion for New Trial "DCO," followed by the appropriate page number.

## STATEMENT OF THE ISSUES

### I.

I.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING FLUTE'S MOTION FOR A MISTRIAL BASED ON THE PROSECUTOR'S COMMENTS EXPLAINING WHY CERTAIN EVIDENCE WAS RELEVANT.

United States v. Franklin, 250 F.3d 653 (8th Cir. 2001)

United States v. Wadlington, 233 F.3d 1067 (8th Cir. 2000)

United States v. Kragness, 830 F.2d 842 (1987)

II.  THE DISTRICT COURT DID NOT ERR IN DENYING FLUTE'S MOTION FOR JUDGMENT OF ACQUITTAL BASED UPON THE GROUNDS THAT THE EVIDENCE WAS INSUFFICIENT.

United States v. Fleming, 8 F.3d 1264 (8th Cir. 1993)

United States v. Turner, 975 F.2d 490 (8th Cir. 1992)

State v. Wilcox, 808 P. 2d 1028 (Utah 1991)

III.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN ALLOWING THE UNITED STATES TO ASK SOME LEADING QUESTIONS OF THE MINOR VICTIMS.

United States v. Longie, 984 F.2d 955 (8th Cir. 1993)

United States v. Rossbach, 701 F.2d 713 (8th Cir. 1983)

United States v. Littlewind, 551 F.2d 244 (8th Cir. 1977)

2

## STATEMENT OF THE CASE

A.   Proceeding Below.

Flute was convicted of two counts of Aggravated Sexual Abuse of a Child, one count of Incest, and two counts of Sexual Abuse of a Minor, in violation of 18 U.S.C. §§ 2241(c), SDCL 22-22-1(6) and 2243(a).  T 416-18.  The nine-count Indictment, which charged the above crimes, was filed on February 22, 2002.  The Indictment also charged that Flute is an Indian and that the offenses occurred in Indian Country, on the Crow Creek Indian Reservation, as jurisdictionally required by 18 U.S.C. § 1153.  R 1.

Gary Flute's three-day trial commenced on September 10, 2002. At the conclusion of the evidence the district court granted Flute's Motion for Judgment of Acquittal regarding Count VII of the Indictment.  T 344.  Following deliberations, the jury returned guilty verdicts as to Counts I, II, III, VIII and IX and not guilty verdicts involving Counts IV, V and VI.  T 416-18.

On September 19, 2002,  Flute filed a Motion for Judgment of Acquittal and a Motion for New Trial alleging that the evidence was insufficient to sustain the jury's verdict, and that Flute had been

3

denied a fair trial as a result of improper comments by the prosecutor. R 89-90. On October 23, 2002, the district court entered a Memorandum Opinion and Order denying Flute's Motion for Judgment of Acquittal and Motion for New Trial. R 99. See United States' Addendum, pages 1-9.

On February 26, 2003, United States District Judge Charles B. Kornmann sentenced Flute to 180 months custody on each of Counts I, II and III and 372 months of custody on each of Counts VIII and IX (the sentences to be served concurrently), followed by five years of supervised release to be completed after his prison sentence. R 118. On March 13, 2003, Flute filed his Notice of Appeal to this Court. R 119.

## STATEMENT OF THE FACTS

A.F. told the jury that from as far back as she can remember her dad, Gary Flute, sexually abused her. T 98-99. In emotional testimony she explained the sexual abuse began by Flute touching her vagina both over and under the clothes and progressing to Flute requiring A.F. to touch his penis, provide him oral sex, and finally have sexual intercourse with him. T 99-120. After many of the

4

incidents, Flute would advise A.F. that this was the last time.  T 103.

In April 2001, after A. F.'s return from a placement at Cinnamon Hills in Utah, the Crow Creek Bureau of Indian Affairs Social Services placed A.F. at her Aunt Estelle Flute's residence in Lower Brule, South Dakota.  T 72.  While staying at Aunt Estelle's home, A.F. went to visit her grandmother at Ft. Thompson, South Dakota, and had contact with her dad.  A.F. told the jury that her dad was drinking that day and asked A.F. to fix him a hamburger.  Flute, because he had not seen her for a long time, then asked A.F. to give him a hug.  After the hug, Flute asked A.F. for a kiss.  A.F. told the jury that she believed her father was planning to renew his sexual abuse on her, but she gave her dad a quick kiss on the cheek.  Flute then tried to kiss her on the mouth.  A.F. claimed she broke away from her dad and got away.  Gary Flute called after her saying, "That's the last time."  A statement A.F. had heard many times before.  T 132-34.

After returning to Aunt Estelle's home, A.F. took out a journal that she had received at Cinnamon Hills residential treatment facility, and wrote four pages in that journal.  T 132.  This four-page entry was read to the jury, at trial, by A.F.'s Aunt Estelle, as follows:

[Estelle Flute]

The person who gave me life was the one who betrayed my personal bubble. The one F'n touched me and made me do things I didn't want to do ever since I was around six years old. When I was little when he did this to me I didn't know what to do but felt shame and disgusted. He would say sick shit like when you get older can I bone you.

BY MR. HANSON:

Q    Can what?

A    Bone you

Q    Do you know what that language means from juvenile kids from working at Pathfinders?

A    Yes.

Q    What does that mean?

A    That's sex.

Q    Okay, thank you.

A    Can I tickle you, can I kiss you? But I would say no but he would do it anyways. And it hurt me. I always wanted to tell someone but they might treat me different. Or if the word would of got out I know other kids would tease me or throw that shit in my face. I had no one to turn to because they would never believe me and my own family –

Q    Hold on a second. Okay.

A    – would reject me and won't love me. Cause I was known as the troublemaker. When I went to St. Joe's Indian School I [sic] glad and very happy to go away from him. No one knew really what was going on with me. And I would tell my mom and brothers and sisters so someone would be there to keep him away or from talking to me. I used to think he would change and when he did I would forgive him for hurting me. I always told myself that even when he hit me and the others. As I got older I decided to tell

6

my sis [Y.F.] and I had her promise me not to tell
　　　　anyone.  But things got worse –
Q　　　Wait just a second.  Okay, go ahead.
A　　　– like the bitching at me for things I didn't, I
　　　　would get hit for it and for not moving as fast as
　　　　they wanted me to.  Then I began to have a bad
　　　　temper.  I wanted my parents to be there to
　　　　support me, not to hurt me, physically,
　　　　mentally, and emotionally, but I couldn't tell
　　　　them that cause I didn't know how.  I still don't
　　　　know how.  After I got out of CH –
Q　　　Do you believe you know what that stands for?
A　　　Cinnamon Hills.
Q　　　Okay, thank you.
A　　　– I came to live with my Auntie Estelle Flute and
　　　　I'm thankful for her always.  I was at my
　　　　grandparents and no one was around but my –
　　　　him and he tried to touch me again but I went in
　　　　the kitchen door and he said, all right, that's the
　　　　last time.

T 79-81.  <u>See also</u> Trial Exhibit 1 (the journal) and Exhibit 2 (a blow-up of four page entry).

After writing this entry in her journal, A.F. put the journal in her duffel bag and put the bag in her closet where her personal belongings were kept.  A.F. did not show the journal to anyone.  T 135.  In the fall of 2001, A.F. ran away from Aunt Estelle's home.  In an effort to try to ascertain where A.F. might have gone, Aunt Estelle went through A.F.'s personal belonging and read A.F.'s journal.  T 74-77.  The next day, when Aunt Estelle found A.F., she took both A.F. and the journal

7

to A.F.'s social worker and the matter was disclosed to law enforcement. T 83-84. Soon thereafter, A.F. was interviewed by Renette Kroupa, a Physician's Assistant at Child Safe Place in Ft. Thompson, South Dakota, and a sexual medical examination was performed on her. T 226. As a result of A.F.'s interview, Y.F., A.F.'s' younger sister, was contacted by authorities. Y.F. had been placed at a different juvenile residential facility in Chamberlain, South Dakota. T 190. The two sisters had not had contact with each other for weeks. T 146. Y.F. was also interviewed and medically examined at Child Safe Place and disclosed a similar pattern of sexual abuse by her father. T 228-29 and 231.

At trial, A.F. told the jury she was 16-years-old (T 93) and testified, in part, as follows:

> Q    Can you tell the jury when the first time you can remember that happened?
> A    When I was real little.
> Q    Do you even know how old you were?
> A    No.
> Q    Do you remember a time where it wasn't happening, when you were even littler?
> A    What do you mean?
> Q    Okay. Do you remember it happening when you were real little? I was trying to understand if you have memory even before it happened where it wasn't happening when you were even

Appellate Case: 03-1717    Page: 14    Date Filed: 05/15/2003 Entry ID: 1644254

younger than when it started.

MS. MINER: Your Honor, I would object to the form of that question. Also as to leading.

THE COURT: Overruled.

BY MR. HANSON:

Q  Did you understand my question?

A  No. Because I can't remember further back.

Q  All right.

A  I don't know how old I was.

Q  It was happening from as far back as you remember, am I understanding that correct?

A  Yes.

Q  Let's – do you know where it was, where it started at, where you were living?

A  I can't remember exactly when it started.

Q  Was it – let me ask you this:
Were you living, was it at Crow Creek, or Lower Brule, or was it someplace off the reservation?

A  I remember Fort Thompson, Mitchell.

Q  Okay. Did – what type of touching, how did it start? Do you understand my question?

A  (No response).

Q  Let me ask you:
What part of his body did he use in the touching when it started?

A  His hands.

Q  And what part of your body was touched with his hands?

A  My private.

Q  And your private area is located where on your body?

A  My vagina.

Q  Okay. When the touching first started was it over or under clothing that you were wearing?

A  Both.

Q  Okay. And where in – do you remember what room or what location in the house it would occur at?

9

A    Sometimes in the bedroom.  Depends on where we were living.

Q    Was it your bedroom or your mom and dad's bedroom?

A    My mom and dad's.

Q    Where were, like, your brothers and sisters?

A    They were, I don't know, usually gone.

Q    How about your mom, where was your mom?

A    I don't know.  She was either out at bingo or going to the store or something.

Q    Do you ever remember in any of these times that somebody being there and seeing it happen, or were you and your dad always by yourself?

A    Once.

Q    In any of the times that this touching happened did anyone else – was anyone in the room, or anyone see it, or were you and your dad alone?

A    We were alone.

Q    Did your family move from Mitchell to Fort Thompson?

A    Yeah.

Q    And where, when you first moved to Fort Thompson, did you stay?  What place did you stay at?

A    At my grandma's.

Q    Okay.  And your grandma's name is?

A    Margaret

Q    And is that place where they live, is that in town or is that a ways out of town?

A    I don't know.  It's in the middle or something.  I don't know.

Q    What part of her house did you folks live in, your family?

A    The basement.

Q    And did all you live down there?

A    Yes.

Q    And were there rooms down there, was it an open basement, or was something done in

10

regard to the basement?

A    Blankets hung up for walls.

Q    Okay. Do you recall any type of touching happening there at that location in the basement of your grandma's?

MS. MINER:    Your Honor, I object to leading questions.

THE COURT:    Well, the Court is inclined to give somewhat more leeway given the age of the witness.

Overruled.

BY MR. HANSON:

Q    Okay, that means you may answer.

A    Yes.

Q    And do you recall what happened in that location, do you remember?

A    What?

Q    The type of touching? Was it the same type with him touching you with his hand?

MS. MINER:    Again I would object to leading.

THE COURT:    Sustained.

Try not to ask leading questions, Mr. Hanson, unless you are not able to obtain an answer by direct questions.

MR. HANSON:  All right.

BY MR. HANSON:

Q    In the basement of your grandmas' house what part of his body would he use to touch you?

A    His hands.

Q    Okay. Any other part?

A    I don't remember.

Q    And what part of your body would he touch?

A    My vagina.

Q    Did you ever touch a part of his body with a part of your body?

A    Yes.

Q    Can you explain that, what part of your body did you use?

A    (Witness sobbing).

11

Q     Your hand or your mouth?

     MS. MINER:    Your Honor, I would object to the leading nature of the question.

     THE COURT:    Overruled.

BY MR. HANSON:

Q     One of those two?

A     Both.

Q     I didn't hear that.

     THE COURT:    Both, she said.

     MR. HANSON:  Both, okay.

BY MR. HANSON:

Q     And what part of his body would you have to touch?

A     His penis.

Q     All right.  Did you ever at any time want to engage in this behavior?

A     No.

Q     Do you recall telling him or saying anything to him about not wanting to do this?

A     Yes.

Q     And would he respond.  Would he say things back?

A     Yes.

Q     What would he say?

A     At times he would say just one more time.

Q     Just one more time?

A     Yes.

Q     Would it just the last time?

A     No.

Q     Did he ever have you put anything with your hand on his penis?

A     Lotion.

Q     Where did you get that lotion?

A     From behind the bed.

T 98-104.

     Additionally, A.F. explained to the jury that her family moved

Appellate Case: 03-1717   Page: 18   Date Filed: 05/15/2003 Entry ID: 1644254

from her grandmother's basement to a trailer next to her grandmother's house and then to their own house at Knot's Landing (a housing area in Ft. Thompson). A.F. stated the sexual abuse continued at all of these different locations. T 104, 108.

A.F. also described an incident that happened in a picnic area by the Missouri River near Ft. Thompson when she was 11, 12 or 13-years-old. T 108. A.F. testified that she was riding around with her dad in the family's blue car. Her dad had been denied access to their home because he had been drinking that night. While driving around Ft. Thompson, and at the picnic area, Flute gave A.F. beer to drink. A.F. remembers feeling the effects of the alcohol and falling asleep on the hood of the car. A.F. told the jury that she was awakened from her sleep by her dad performing oral sex on her. Flute then placed her in the back seat of the car and had sex with her – putting his penis in her vagina. After this sexual assault A.F. remembers her dad driving them back to her grandmother's house and A.F. passing out in the backseat of the car after throwing up on the car seat. A.F. remembers the next morning being carried into her grandmother's house by her Uncle, Steven Flute. T 109-20 and 135-

Appellate Case: 03-1717    Page: 19    Date Filed: 05/15/2003 Entry ID: 1644254

36. At trial, Steven Flute corroborated this incident. Steven Flute confirmed that he remembered a time when he observed A.F. intoxicated in the back seat of his brother's blue car and he recalled seeing vomit on the back seat next to A.F. T 254-55. Steven Flute explained that the incident happened before November of 2001 and was two to three years prior to trial. T 255, 259. Steven Flute testified that he picked A.F. up out of the car and helped her into his mother's house to bed. T 257. This incident was the basis for Counts I, II and III of the Indictment.

A.F. gave further testimony describing a specific sexual assault by her father in her father's bedroom at Knot's Landing, but Flute was acquitted of the counts in the Indictment related to this incident (Counts IV, V and VI). Therefore, on appeal the United States will submit no further facts involving this sexual assault. T 137-40.

At trial A.F. also told the jury that she was afraid of her dad and that her dad had assaulted her mom, her brothers, her sisters and her in the past. T 140-41. A.F. stated that her dad had struck her in the head with a closed fist and had used a belt to assault her. T 141. She explained that in the past she had attempted suicide by trying to hang

14

herself with an extension cord (T 142) and had discussed her abuse when she was very young, while still in Mitchell, South Dakota, with her sister, Y.F. T 143-44. In that discussion, A.F. learned that her dad was doing the same things to Y.F., and A.F. told the jury that therefore she thought what her dad was doing to her was "normal." T 144.

On cross-examination, A.F. admitted she had been sent to at least ten different residential treatment programs. T 150. A.F. agreed that she had been sent to these placements because she had chemical dependency problems, uncontrolled anger problems, and had run away many times. T 150-51 and 160-62. A.F. admitted that at all of these placements she failed to disclose her sexual abuse by her dad. T 168. On redirect, when asked why she had kept her abuse a secret, A.F. explained:

> Q   [A.F.], why didn't you tell anybody about this?
> A   Because I was afraid my family would treat me bad. They were going to disown me from the family or something and make me an outcast, like I didn't belong to the family.
> Q   Has a lot of what you predicted happened to you?
> A   Yes.
> Q   Why can't you remember a specific date?
> A   Because –

15

Q    Did it happen so many times?
A    Yes.

T 171.

After A.F. testified, her sister Y.F. took the witness stand.  Y.F. told the jury that she was 13-years-old and she had come to trial from Heartland Hospital in Nevada, Missouri.  T 175-76.  Y.F. advised the jury that her dad began to sexually abuse her when she was five to six-years-old in Mitchell, South Dakota, where the family lived.  T 177.  This abuse involved her dad touching her vagina and breasts.  T 178.  Y.F. recalls her family moving from Mitchell, South Dakota, to her grandmother's basement in Ft. Thompson, South Dakota, then to a trailer next to her grandmother's house and finally to a residence in Knots Landing.  T 178-80.  Y.F. stated the sexual abuse continued in all of these places.  T 181.

Q    When you were living in grandma's in the basement, and at the trailer, and at Knots Landing did this touching continue?
A    Yes.
Q    Did it change in any way and become different types of touching?
A    It was just the same.
Q    Did your dad ever have you touch him?
A    Yes.
Q    Okay.  And what part of your body did you have to use?

Appellate Case: 03-1717    Page: 22    Date Filed: 05/15/2003 Entry ID: 1644254

| A | My mouth and my hand. |
|---|---|
| Q | All right. And when we go to the hand, what – with your hand, what would you touch? |
| A | His dick. |
| Q | All right. And would you ever have to use something and put on associated with – or with touching him? |
| A | I put lotion on my hands. |
| Q | Okay. Where would you get the lotion from? |
| A | It was by the bed. |
| Q | What kind of lotion are we talking about? Was it – what kind of bottle was it? |
| A | I don't remember. |
| Q | How would you know to do that? |
| A | He told me to. |
| Q | All right. Would touching him happen both at your grandma's and at Knots Landing? Did that happen at both places? |
| A | Yes. Not at Knots Landing. Just in my grandma's house. |
| Q | Just your grandman's (sic) house. And when he made you touch him with your mouth what part of his body did you have to touch? |
| A | His dick. |
| Q | And would it go inside your mouth? |
| A | Yes. |
| Q | And would he move in any way? |
| A | No. |
| Q | Okay. Would you? |
| A | I would go up-and-down on his dick with my mouth. |
| Q | All right. How did you know to do that? |
| A | He told me to. |

T 181-82. (This testimony was the basis for Count IX).

Y.F. testified about a specific incident she could remember that

happened when she was in the third or fourth grade. T 185. This incident happened in the trailer house next to her grandmother's residence. T 184. Y.F. recalls that during this incident her dad told her to come into his bedroom and "start rubbing his 'dick'." Flute then asked Y.F. if she thought it would hurt "if he stuck it in me?" T 186. Flute then made her, with no clothes on, get on top of him on his bed and he <u>touched</u> his "dick" to her vagina and <u>tried to put it inside her</u>, but it would not go. T 187. Y.F. remembers this incident was interrupted by her mom returning to the trailer. T 188. This set of facts is the basis for Count VIII of the Indictment.

In further testimony, Y.F. told the jury that she, like her sister, had tried to commit suicide – both by cutting her wrists and by trying to hang herself. T 191. Y.F. also admitted to engaging in self-mutilation behavior by cutting up and down her arms and she showed the jury her scars. T 191-92. Y.F. explained that she engaged in this self-destructive conduct because, "It feels like it takes the pain away," T 192.

Finally, Y.F. told the jury that except for telling her sister in Mitchell, South Dakota, when she was very young, she kept the sexual

Appellate Case: 03-1717     Page: 24     Date Filed: 05/15/2003 Entry ID: 1644254

abuse by her dad a secret because she "felt ashamed of it and I didn't want my dad to go to jail." T. 193-95. Y.F. also stated she was very worried about how her family would react to the disclosure of her sexual abuse by her dad. T 195.

On cross-examination, Y.F. admitted she had been to seven different residential treatment programs for running away and cutting herself. T 196. She agreed with the defense counsel that she had anger and chemical abuse problems (T 196-97) and that as a witness she was under special conditions, with a guard in the courtroom, to try to protect her from hurting herself or from running away. T 204-05. Significantly, when asked on cross-examination if anything came out of her following the incident in the trailer, Y.F. responded, "A little bit of blood and some white." T 203. On redirect Y.F. admitted that when she first got her trial subpoena she immediately engaged in cutting herself by breaking the crystal of her watch and using it to cut her arms. T 207-08.

In addition to the victims' evidence, the jury heard testimony from Renette Kroupa, a Physician's Assistant, who medically examined the sisters and Dr. Richard Kaplan, who supervised Ms.

19

Kroupa, and reviewed Kroupa's video tape of the medical examination. Both testified about their training and experience in sexual abuse medical examinations. T 221-23 and 243-46. Dr. Kaplan explained to the jury that he is a pediatrician and the Medical Director of the Center on Child Abuse and Neglect at Sioux Valley Children's Hospital in Sioux Falls, South Dakota. Dr. Kaplan stated that he has examined over a thousand children who allegedly have been sexually abused. T 244. Both Dr. Kaplan and PA Kroupa advised the jury that A.F and Y.F. had medical findings consistent with penetration of their vaginas. T 227, 230, 247-48.

Additionally, Linda Holcomb, a licensed clinical social worker, who has extensive experience and training in the area of child sexual abuse, (T 270-62) advised the jury that there are often emotional and behavioral characteristics associated with children that have been sexually abused. T 262. Those characteristics include:

1. Unusual sexual knowledge;

2. Running away;

3. Suicide attempts;

4. Self-mutilation to block out the emotional pain;

Appellate Case: 03-1717    Page: 26    Date Filed: 05/15/2003 Entry ID: 1644254

5.    Lack of trust in others;

6.    Feeling of embarrassment and anxiety;

7.    Hyper vigilant;

8.    Sleep problems;

9.    Alcohol and chemical use to escape feelings;

10.   Anger control problems; and

11.   Acting out behavior – fights with others.

T 263-65.

In further expert testimony, Ms. Holcomb advised the jury that delays in reporting interfamily sexual abuse are very common because the victims are often embarrassed, or afraid of what might happen to the perpetrator, and/or the response of their family member. T 264-68. Finally, Ms. Holcomb opined that abuse over a long period of time, with numerous incidents, makes it very difficult for young victims to recall specific dates. The abuse of the victims all seems to blend together. T 271-272.

Chepa Valandra, A.F.'s Bureau of Indian Affairs Social Worker and Dr. David Meyer, Y.F.'s psychological therapist at Heartland Hospital also testified at trial. They provided the jury information they

observed regarding A.F. and Y.F.'s emotional and behavioral problems. Chepa Valandra, who has worked with A.F. for approximately four years, stated that A.F. ran away from home a lot, had suicidal tendencies, violent behavior toward others, low self-esteem and clinical signs of depression. T 321-22.

Dr. David Meyer, who has a Doctorate in Psychology and a Masters Degree in Social Work, told the jury that as Y.F.'s therapist at Heartland Hospital, he was aware that Y.F. had clinical signs of ongoing depression, had made several attempts to run away from the facility, engaged in destructive behavior at Heartland Hospital and frequently engaged in self-mutilation. T 328-30. Dr. Meyer advised the jury that he had observed a correlation between Y.F.'s self-mutilation and her therapy session in which she discussed her allegations of sexual abuse by her dad. T 330. Additionally, Dr. Meyer stated that the emotional and psychological behavior problems, he observed in Y.F., were extremely intense. T 334.

Finally, Flute stipulated that he is an Indian and the places alleged in the Indictment where the alleged offenses occurred were in Indian Country, on the Crow Creek Indian Reservation. T 240-41.

Appellate Case: 03-1717     Page: 28     Date Filed: 05/15/2003 Entry ID: 1644254

## SUMMARY OF ARGUMENT

A single isolated comment by the prosecutor, after being invited to respond to defense counsel's objection, did not deprive Flute of a fair trial. This fact is especially true in light of the trial record which establishes that the district court twice advised the jury that statements of counsel were not evidence. Additionally, the properly admitted evidence of conviction in this case was strong and the trial court immediately took curative action by sustaining Flute's objection and admonishing the jury to disregard the prosecutor's comment.

Secondly, the evidence was sufficient, when viewed in the light most favorable to support the jury finding, to uphold Flute's conviction. There was no significant variance between the dates testified to by A.F. and the dates set forth in the Indictment. The district court's record is clear that the acts charged in Counts I, II and III of the Indictment were committed within the statute of limitations and before the return of the Indictment. Any "vagueness" by A.F. in recalling specific dates of the abuse does not go to the adequacy of the Indictment and specific dates are not a material element to the crimes charged. Likewise, there is sufficient evidence to support Flute's

Appellate Case: 03-1717    Page: 29    Date Filed: 05/15/2003 Entry ID: 1644254

conviction of Counts VIII and IX.

Finally, the district court did not abuse its discretion by allowing some leading questions to be asked to elicit difficult testimony from the young victims, who were obviously nervous and upset.

ARGUMENTS

I.

THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING FLUTE'S MOTION FOR A MISTRIAL BASED ON THE PROSECUTOR'S COMMENTS EXPLAINING WHY CERTAIN EVIDENCE WAS RELEVANT.

A.    Standard of Review

A court's decision on a motion for a mistrial may be reversed only on a showing of abuse of discretion. United States v. Villalpando, 259 F.3d 934, 937 (8th Cir. 2001); United States v. Travis, 993 F.2d 1316, 1322 (8th Cir. 1993). An abuse of discretion occurs "when a relevant factor that should have been given significant weight is not considered, when an irrelevant or improper factor is considered and given significant weight, or when all proper and no improper factors are considered, but the court in weighing those-factors [sic] commits a clear error of judgment." United States v. Huerta-Orozco, 272 F.3d 561, 566 (8th Cir. 2001) (quoted cases omitted). "While the authority

24

to set aside a jury verdict and grant a new trial 'should be exercised sparingly and with caution,' the trial court 'has wide discretion in deciding whether to grant a new trial in the interest of justice.'" Id. (quoting United States v. Lincoln, 630 F.2d 1313, 1319 (8th Cir. 1980)).

An improper statement by the prosecution, if made in an otherwise fair trial, will not necessarily warrant reversal of the conviction. The statement should be examined within the context of the entire trial to determine if prejudicial error occurred. United States v. Franklin, 250 F.3d 653, 660-61 (8th Cir. 2001). In deciding whether there was prejudicial error, this Court has cited three factors, that warrant consideration:

1. The cumulative effect of the misconduct;

2. The strength of evidence properly admitted; and

3. The curative action taken by the trial judge.

United States v. Wadlington, 233 F.3d 1067, 1077 (8th Cir. 2000).

B. Factual Backdrop.

In direct testimony regarding A.F., her Bureau of Indian Affairs social worker, Chepa Valandra, gave the following direct testimony:

25

Q    You had talked about family contact.
     In these placement places they have a family component?
A    Yes.
Q    Can you explain that?
A    A lot of what we do is we work <u>to resolve issues which led to placement of the child in a group care setting or foster care setting, whatever it may be. We try to strive to get families involved so that we're all looking to change what precipitated the placement</u>. So group care settings have a family therapy component where families are able to come, spend some time there, participate in family therapy.

     When we have a placement out-of-state we have a couple different options we do. We do family therapy by phone, which is secondary, of course, to being there in person. And some of the facilities that we use out-of-state we also pay for families to go for a week of family therapy.

Q    Okay. So you offer – you offer these childrens' families an opportunity to come to your office and use the phone for free and talk?
A    Yes.
Q    And in some instances you'll even pay for them to go to the facility?
A    Yes. . . .
     BY MR. HANSON:
Q    Did you see any effort on the part of her [A.F.'s] mom and dad to try to address problems that [A.F.] appeared to have?
     MS. MINER:    Your Honor, I would object as to relevancy.
     MR. HANSON:  Well –
     THE COURT:    Just a minute.
Do you want to respond?
     MR. HANSON:  I would –
     THE COURT:    Do you want to respond?

26

> MR. HANSON:  I would want to respond.
> THE COURT:  <u>You may respond.</u>
> MR. HANSON:  Your Honor, this is evidence
> that they didn't want <u>this to come up</u>.
> MS. MINER:  Your Honor, that's totally
> improper.  I object on relevance.
> THE COURT:  The jury should disregard.  That
> may be evidence that they're bad parents, but they're not
> on trial here for that.
> I don't think you should go into that.
> Sustained.

T 323-24.  (Emphasis added).

The United States contends that as the testimony of Ms. Valandra reveals, family counseling sessions are important tools, used by social services, to resolve and understand what caused a child to be placed at a residential treatment facility in the first place.  Gary Flute did not want to participate in family therapy session because he did not want his systematic sexual abuse of A.F. to "come up."  Later in the trial, after the Motion for Mistrial was made, (T 347-48) the United States attempted to explain this line of questioning as follows:

> MR. HANSON:  Your Honor, my understanding, the witness [Chepa Valandra] is talking about the family, the defendant is not coming to treatment places to try to discuss what is wrong with the child, why the child is acting in that way.  That's what I was asking questions about; did the defendant go to the family sessions as being allow – you know, remember, her office allowed trips, they paid for trips, they set up the phone.  You invited me to

explain why I thought the evidence was relevant, I think is [sic] the scenario of that, and I said because they didn't want to deal with the situation. I didn't say they didn't want to deal with the sexual abuse, they didn't want to deal with him sexually assaulting these girls. I mean, they didn't want to deal with the situation, I think that's evidence that shows that. I don't think it comments on his silence. I don't think it – it certainly was two or three words in regard to the long trial, Your Honor.

T 348-49.

Said more clearly, and not in the pressure cooker of a trial, the United States contended that the anticipated testimony regarding Flute's failure to participate in family therapy sessions with A.F. was circumstantial evidence which suggests Flute knew what had caused her emotional and psychological problems and did not want his secret to be disclosed. Flute did not want anyone to understand the cause of his child's placement in residential treatment programs because it was his own sexual abuse.

While the district court did not accept the United States' rationale – and concluded the evidence would merely establish that the Flutes were bad parents – it nevertheless refused to grant Flute's Motion for Mistrial. T 349. Following the trial, Flute raised this issue in his Motion for a New Trial and the district court in its response

Appellate Case: 03-1717    Page: 34    Date Filed: 05/15/2003 Entry ID: 1644254

concluded that while it still believed the comment was inappropriate, the prosecutor's statement was an "isolated comment in a three-day trial" (DCO 7) and that Flute could not establish a connection between this comment and the jury's note about why Flute's wife did not testify.  DCO 7-8.

Secondly, the district court held that the properly admitted evidence was strong (DCO 8) and, finally, that the district court took "swift and profound" measures to cure the situation.  DCO 8.  Judge Kornmann noted that he immediately sustained Flute's objection and told the jury to disregard the prosecutor's comment.  Additionally, the district court pointed out that, in its opinion, the Assistant United States Attorney followed the court's command and never again went into this area of inquiries or made any further inappropriate remarks.  DCO 8.  The district court in its Memorandum Opinion and Order concluded that this contention "did not deprive the defendant of a fair trial."  DCO 8.

In regard to this issue on appeal, the United States would also note that both in the preliminary instruction to the jury, (T 56) and in the final instruction to the jury, (Final Jury Instruction #5) the trial

Appellate Case: 03-1717     Page: 35     Date Filed: 05/15/2003 Entry ID: 1644254

court advised jury members that statements, arguments, questions, and comments by the lawyers are not evidence. The United States, on appeal, would urge this Court to adopt the district court's finding and conclude that this alleged improper comment, of one sentence, was harmless error. See Chapman v. California, 386 U.S. 18 (1967), and United States v. Kragness, 830 F.2d 842, 867 (1987).

II.

THE DISTRICT COURT DID NOT ERR IN DENYING FLUTE'S MOTION FOR JUDGMENT OF ACQUITTAL BASED UPON THE GROUNDS THAT THE EVIDENCE WAS INSUFFICIENT.

A.    Standard of Review

In considering a motion for acquittal or directed verdict, based on the argument that the evidence was not sufficient to support the verdict of the jury, the proper standard of review, as stated by this Court in Durns v. United States, 562 F.2d 542 (8th Cir. 1977), is as follows:

> On appellate review of the sufficiency of the evidence, the court must view the evidence in the light most favorable to the verdict rendered. It must accept as established any and all reasonable inferences from the evidence that tend to support the jury's verdict. The evidence need not "exclude every reasonable hypothesis except that of guilt [; it is enough] that it be sufficient to convince the jury beyond a reasonable doubt that the defendant is guilty."

30

<u>Id</u>., at 545-46 (citations omitted) (quoting <u>United States v. Shahane</u>, 517 F.2d 1173, 1177 (8th Cir. 1975)).

      B.    <u>Counts I, II and III Involving A.F.</u>

A.F. testified that her birthday is April 22, 1986, and she was 16-years-old at the time of trial. T 93. At trial she testified that she believed she was between 11, 12 or 13-years-old when her dad sexually abused her at the picnic area near the river. T 108. Thus, the time frame A.F. testified to would be from April 22, 1997 to April 23, 1999. Counts I, II and III of the Indictment charge Gary Flute with two counts of Sexual Abuse of a Minor and Incest on or between April 22, 1998 to April 22, 1999. R 1. At the outset, the United States contends the time frames in the Indictment are reasonably close to the time frames set forth in A.F.'s trial testimony. While it is true A.F., at several times during her testimony, honestly advised the jury she could not remember specific dates – she also told the jury the reason for this failure was that the sexual abuse had happened so many times. T 171.

"An indictment is legally sufficient on its face if it contains all of the essential elements of the offense charged, fairly informs the

31

defendant of the charges against which he must defend, and alleges sufficient information to allow a defendant to plead a conviction or acquittal as a bar to a subsequent prosecution." <u>United States v. Fleming</u>, 8 F.3d 1264, 1265 (8th Cir. 1993).

Experts in the field of child sexual abuse note that it is very difficult, if not impossible, for young children to specify the date and time of a past event. "Time is a very complicated, abstract concept. Infants are not born with a sense of time. Adults reason backwards through time to determine approximately when something occurred. Adult reasoning is aided by knowledge of the daily and annual cycle of time. Young children have limited experience and knowledge on which to base their reconstructions of past events. Until children learn the conventional systems of measuring time, adult reasoning processes about time are not available to them." <u>See</u> <u>The Development Psychology of Time</u> (W. Friedman ed. 1982).

Young sexual abuse victims' problems with time and dates have been recognized by several appellate courts. <u>See</u> <u>State v. Wilcox</u>, 808 P. 2d 1028, 1033 (Utah 1991); <u>State v. Swallow</u>, 350 N.W.2d 606, 608 (S.D. 1984); <u>State v. Becker</u>, 351 N.W.2d 923, 927 (Minn. Ct. App.

Appellate Case: 03-1717     Page: 38     Date Filed: 05/15/2003 Entry ID: 1644254

1984); and State v. Williams, 363 N.W.2d 911, 914 (Minn. Ct. App. 1985).

In State v. Wilcox the defendant, at the trial level, successfully moved to dismiss the state's information charging him with sexual abuse of a child and sodomy. In reversing the trial court's decision, the Supreme Court of Utah held:

> [W]e have recognized that there are notice problems, especially as to the date, place, and time, inherent in prosecutions based on the testimony of very young victims. For example, in Robbins, we noted that "children are often not able to identify with a high degree of reliability, and sometimes not at all, when an event in the past took place." Robbins, 709 P.2d at 773; see also Marcum, 750 P.2d at 601 (seven-year old gave "inconsistent and sometimes conflicting accounts of where the abuse took place"). The problem of young children who are unable to specify a date on which abuse occurred or a location where it occurred is exacerbated by situations in which the abuse occurred on many occasions over a long period of time, a not-uncommon occurrence. See, e.g., State v. Rimmasch, 775 P.2d 388, 390 (Utah 1989); Marcum, 750 P.2d at 601; State v. Loughton, 747 P.2d 426, 428-29 (Utah 1987); State v. Walker, 743 P.2d 191, 193 (Utah 1987); State v. Lairby, 699 P.2d 1187, 1191 (Utah 1984), overruled in part, State v. Ossana, 739 P.2d 628 (Utah 1987); Bundy, 684 P. 2d at 60. If we were to hold that in all such circumstances, no offense could be charged because the alleged victim is too young to testify with certainty concerning the time, dates, or places where the abuse occurred, we would leave the youngest and most vulnerable children with no legal protection. An abuser could escape prosecution merely by claiming that the child's inability to remember the exact

33

**dates and places of the abuse impaired the abuser's ability to prepare an alibi defense.**

State v. Wilcox, supra at 1032-33.  (Emphasis added).

Other state appellate courts, which have reviewed this issue, have also concluded a time frame is sufficient to inform the defendant of charges involving sexual abuse of children.  See People v. King, 581 P.2d 739 (Colo. App. 1978).  In King, the Colorado Appellate Court concluded that "specific date of the offense was not a material allegation in prosecution for sexual assault on a child."  Likewise, the Kansas Supreme Court ruled that allegations of child abuse and torture were as specific as possible under the circumstances.  State v. Wonser, 537 P.2d 197 (Kan. 1975); State v. Fahy, 440 P.2d 566 (Kan. 1968); State v. Kilpatrick, 578 P.2d 1147 (Kan. App. 1978).  In California, the precise time of the crime is not required in criminal pleadings.  It is sufficient if it alleges any time before filing of the information, except where time is a material ingredient of the offense.  People v. Wrigley, 443 P.2d 580 (Cal. 1968).

This Court, in United States v. Turner, 975 F.2d 490, 495 (8th Cir. 1992) has stated:

[A] variance between the date in the indictment and the

34

proof is not fatal if the proof shows that the acts charged were committed within the statute of limitations and prior to the return date of the indictment, as long as the date was not a material element of the crime charged.

United States v. Turner, 975 F2d 490, 494(8th Cir. 1992).

In the present case, there is no substantial variance between the dates in the Indictment and the dates to which A.F. testified at trial. Additionally, the jury in this case heard expert testimony from Linda Holcomb regarding the difficulty for young individuals, who have been sexually abused over an extended period of time, to recall exact dates. T 271-72.

Clearly, the evidence at trial established that the incident that happened to A.F. in and on Flute's blue car, as charged in Counts I, II and III of the Indictment, were committed within the statute of limitations for federal crimes involving child sexual abuse; and the acts charged occurred prior to the return of the Indictment on February 22, 2002. The United States submits that the exact dates of the sexual assault are not a material element of the crime charged and the alleged "vague" nature of A.F.'s testimony does not go to the constituted adequacy of the Indictment, but only to the credibility of the United States' case. The United States submits a jury of twelve

Appellate Case: 03-1717     Page: 41     Date Filed: 05/15/2003 Entry ID: 1644254

heard all of the evidence, including the victim's testimony, described by Flute as "fuzzy and vague," and concluded Flute was guilty of sexual assaults of A.F., as charged in Counts I, II and III. This Court should not reverse this finding on appeal.

C.   Counts VIII and IX Involving Y.F.

Flute on appeal contended there was insufficient evidence to establish penis vulva penetration on Y.F., as charged in Count VIII of the Indictment. Count VIII involves the sexual assault by Flute on Y.F. in the family trailer house next to her grandmother's house.

At trial, Y.F. testified that this incident began when her dad directed her to start rubbing his penis and then asked her if she thought it would hurt if he put it in her. Flute then made her get on top of him in the bedroom in the trailer. Y.F. stated her clothes were off and her dad touched his "dick" to "my vagina," but it would not go inside. T 186-87. Y.F. explained that her mom interrupted the sexual assault and later her mom thought Y.F. was having her period because she saw blood on Y.F. T 208. (Y.F. testified she did not get her first period until several years later.) T 209.

While the United States would note that the federal definition of penetration is very liberal – that being any penetration, however slight, of the victim's <u>vulva</u> – and the vulva is a part of a woman's anatomy that is outside the vagina. Therefore, it is very likely that the jury in this case concluded that Flute's penis touching the victim's vagina constituted a completed act of sexual abuse.

A cursory review of Count VIII of the Indictment reveals that Flute is charged with knowingly causing or "<u>attempting to cause [Y.F.] to engage in a sexual act</u>." R 1. Obviously, the testimony that Flute questioned his daughter about whether it would hurt if he put "it" in her, combined with his touching his "dick" to the victim's vagina is sufficient evidence for the jury to conclude that Flute <u>attempted</u> to engage in the charged sexual act in violation of 18 U.S.C. § 2241(c). The statute provides that an attempted sexual act completes the crime charged.

It is unclear in Flute's Appellate Brief why he claims the evidence was insufficient as to Count IX. AB 14. Y.F. clearly provided testimony to establish that count. That testimony was set forth in the United States' statement of fact, but in summary: Y.F. described that

Appellate Case: 03-1717   Page: 43   Date Filed: 05/15/2003 Entry ID: 1644254

on more than one occasion when she was in the third or fourth grade her father directed her to engage in oral sex. Her description of the contact clearly established the elements of that crime as alleged in Count IX of the Indictment and there is sufficient evidence in the record, when viewed in the light most favorable to support the jury's verdict, to uphold both of the convictions involving Y.F.

III.

THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN ALLOWING THE UNITED STATES TO ASK SOME LEADING QUESTIONS OF THE MINOR VICTIMS.

A. <u>Standard of Review</u>.

"[Appellate courts] review the evidentiary rulings of a district court only for abuses of discretion, [citations omitted], and will reverse only when an improper evidentiary ruling affects the substantial rights of the defendant or when we believe that the error has had more than a slight influence on the verdict . . . ." <u>United States v. Ballew</u>, 40 F.3d 936, 941 (8th Cir. 1994). The use of leading questions is a matter left to the discretion of the District Court. <u>United States v. Butler</u>, 56 F.3d 941 (8th Cir. 1995); <u>United States v. Schepp</u>, 746 F.2d 406, 410 (8th Cir. 1984); <u>United States v. Drake</u>, 542 F.2d 1020, 1022 (8th Cir.

38

1976).

    B.  <u>Use of Leading Questions Was Not an Abuse of Discretion</u>.

Rule 611(c) of the Federal Rules of Evidence provides as follows:

> Leading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony. Ordinarily leading questions should be permitted on cross-examination. When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions.

The Advisory Committee notes to Rule 611(c) state that with respect to leading questions, "[t]he matter clearly falls within the area of control by the judge over the mode and order of interrogation and presentation and accordingly is phrased in words of suggestion rather than command." Fed. R. Evid. 611(c) Advisory Committee Note to Subdivision (c). The Advisory Committee's notes confirm that numerous exceptions have achieved recognition. For example, the witness who is "hostile, unwilling, or biased; <u>the child witness or the adult with communication problems</u> . . . ." (Emphasis added.) Fed. R. Evid. 611(c) Advisory Committee Note to Subdivision (c).

    In his brief, Flute claims that the United States asked seventeen objectionable leading questions of A.F. during her testimony, and that

39

without the use of leading questions the evidence would have been insufficient to sustain the jury verdict. Some examples of Flute's seventeen trial objections during A.F.'s testimony, based on alleged leading questions, are as follows:

1.   When you were growing up how would you describe your house? Was it calm, peaceful or how would you describe it? T 97.
2.   All right. Did there ever come a time when, in your lifetime, when someone touched you in a way that made you sad, or upset, or hurt you? T 97.
3.   Okay. Do you recall any type of touching happening there at that location in the basement of your grandma's? T 101.
4.   Did it happen after or before you went to a placement place? T 108.
5.   Do you know what time he came back, whether it was early or late, or nighttime, or daytime. T 109-110.
6.   Did you stay in the car, did you walk anyplace from the car? T 109-110.
7.   Was his body moving in any way? T 120.

Out of the sixteen objections based on leading questions, the trial court only sustained six. Moreover, several times during the trial the court stated, or indicated, it would allow some leading questions based on the young age of the victim. T 101-02, 104 and 123.

This Court has permitted the use of leading questions "in order to develop testimony given by an unusually softspoken [sic] and

frightened witness." <u>United States v. Grey Bear</u>, 883 F.2d 1382, 1393 (8th Cir. 1989); <u>United States v. Nabors</u>, 762 F.2d 642, 650 (8th Cir. 1985). The use of leading questions of an articulate victim who was able to understand the questions has also been approved. <u>United States v. Longie</u>, 984 F.2d 955, 958 (8th Cir. 1993). "The government's use of leading questions to elicit such difficult testimony from a young girl was entirely appropriate." <u>Id</u>. at 958.

Also, the use of leading questions in cases quite similar to this one have been approved. A panel of this Court approved the use of leading questions of two victims, ages fifteen and seventeen, when they were reluctant to answer questions regarding the sexual assaults. <u>United States v. Rossbach</u>, 701 F.2d 713, 718 (8th Cir. 1983). This Court has also allowed leading questions of a fifteen-year-old witness who was nervous and upset. <u>United States v. Littlewind</u>, 551 F.2d 244, 245 (8th Cir. 1977).

In the instant case, it is clear from the trial testimony that A.F. was extremely upset during parts of her testimony (T 121-123) and based upon the victim's age, and the necessity to develop her testimony, the district court properly allowed the use of some leading

41

questions.  T 104, 121, 122-24.  The United States contends the trial judge had ample opportunity to observe the necessity of allowing leading questions and, under the circumstances, did not abuse its discretion, in allowing such questions, in the few times it occurred.

## CONCLUSION

For the reasons stated herein, the United States respectfully requests that the final judgment by the district court, following a jury trial, be affirmed.

JAMES E. McMAHON
UNITED STATES ATTORNEY

_____
MIKAL HANSON
Assistant United States Attorney

42

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief was prepared using Corel WordPerfect 9.0 and contains 9,095 words in proportional spacing in 14-pt. type , and is, therefore, in compliance with FRAP 32(7)(B)(i).  I further certify that I have provided to the court and to each party separately represented by counsel a 3 ½  inch diskette containing the full text of the brief.  The diskettes have been scanned for viruses using Inoculan 4 for Windows NT and are virus free.

_____

MIKAL HANSON
Assistant United States Attorney

## CERTIFICATE OF SERVICE

The undersigned attorney for Plaintiff-Appellee United States of America, hereby certifies that service of the foregoing appellee's brief was made upon the appellant by mailing by first class mail, postage prepaid, two true and correct copies thereof and one 3-1/2 inch diskette containing the brief to appellant's attorney of record at the post office address as shown, on this _____ day of May, 2003:

Jana Miner
Federal Public Defender's office
124 S. Euclid, Ste. 202
Pierre, SD 57501

_____

MIKAL HANSON
Attorney for Appellee
United States of America
225 S. Pierre St., Rm. 337
Pierre, SD  57501-2489
(605) 224-5402
E-Mail:  mikal.hanson@usdoj.gov

43

# ADDENDUM